**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

HUONGSTEN PRODUCTION IMPORT
& EXPORT CO. LTD, *et al.*

    Plaintiffs.

v.

SANCO METALS LLC., *et al.*

    Defendants,

**Civil No. 10-1610 (SEC)**

**OPINION AND ORDER**

    Before the Court are plaintiffs Huongsen Production Import & Export Company LTD a/k/a Senprodimex Vietnam ("Senprodimex"), Linh Hoang, and Tung Mai's (collectively "Plaintiffs") Motion for Partial Summary Judgment (Docket # 44);[1] Corporación LAREB and Héctor Ayala's (collectively "LAREB"),[2] as well as Sanco Metals LLC and Sanco Metal & Recycling Center-Puerto Rico Branch, Helen Lyvuong,[3] and Michael Nguyen's (collectively "SANCO") oppositions thereto (Dockets ## 111 & 116).[4]  After reviewing the filings and the applicable law, Plaintiffs' motion is **GRANTED IN PART AND DEFERRED IN PART**.

---

    [1] Senprodimex is a limited liability company organized under the laws of the Socialist Republic of Vietnam. Hoang and Mai are Senprodimex's representatives.

    [2] Hector Ayala, LAREB's president, is being sued in his personal capacity. For simplicity's sake, however, the Court will refer to Ayala and LAREB indistinctively.

    [3] Lyvuong is SANCO's sole officer or agent identified in the Puerto Rico and California State filings.

    [4] Plaintiffs replied (Docket # 134); SANCO and LAREB filed surreplies (Dockets ## 146 & 150). The parties also filed the following supporting documents: Plaintiffs's Statement of Uncontested Facts ("SUF"), Docket # 45; LAREB's Opposition to Statement of Uncontested Facts, Docket # 110; SANCO's Opposition to Statement of Uncontested Facts, Docket # 117.  Finally, Plaintiffs filed a L. Civ. R 56(d) Reply Statement of Facts (Dockets # 135).

**Factual and procedural Background**

This diversity action originated on July 2, 2010, when Plaintiffs filed suit for breach of contract and damages against SANCO and LAREB, among others. Docket # 1.[5] Plaintiffs' claims center around allegations that defendants bamboozled them into disbursing almost three million dollars by issuing contracts for the extraction of steel and scrap metal from the Lafayette Mill (the "Mill"), in Arroyo, Puerto Rico.[6]

Barely 3 months into the case, Plaintiffs filed the present motion. In it, they request that this Court (1) annuls the November 9, 2009 contract between SANCO and Plaintiffs (the "SANCO-Plaintiffs Contract") , or alternatively declares it resolved and terminated because of SANCO's material breaches; (2) orders SANCO to return to Plaintiffs  $2,280,000 of which LAREB is jointly liable in the amount of $850,000, as well as money judgment for the same amounts; and (3) enters judgment against SANCO and LAREB, jointly for $2,960,000. Docket # 44, p. 36-37.[7] They predicate these claims on general provisions of Puerto Rico's contractual and tort law, and the doctrine of unjust enrichment.[8]

---

[5]The remaining co-defendants are the following: Zen America Capital Corporation ("Zen America"), Hiep Dang, Mike Hai-Tran ("Mike Tran"), Puerto Rico Salvage & Demolition Corp ("PRSD") , and Jorge P. Adorno-Del Valle ("Adorno") (collectively the "Defaulted Defendants"). On March 14, 2011, this Court entered a Nunc Pro Tunc Amended Default Partial Judgment against the Defaulted Defendants. Docket # 165.

[6] Asociacion Azucarera Cooperative Lafayette ("Asociacion") owns the Mill. SUF ¶ 2.

[7] Regarding the claims against the Defaulted Defendants, the present motion mirrors the relief sought by Plaintiffs on their motion for default judgment. See Dockets ## 127 &134, p. 4. Because this Court granted that motion, thereby entering a Nunc Pro Tunc Amended Default Partial Judgment against the Defaulted Defendants, see  Docket # 165, these claims are not addressed here. In other words, the Court will confine its attention to the claims against SANCO and LAREB.

[8] Plaintiffs' motion for partial summary judgment also advances claims against Ayala under Article 4.07 of Puerto Rico's General  Corporation Law, P.R. Laws Ann. tit. 14, § 2727. But because

---

LAREB timely opposed, arguing that both LAREB and Ayala did not, and could not, participate in the allege scheme to defraud Plaintiffs; that they made no misrepresentations; and that there are genuine issues of material fact which preclude entry of summary judgment. Docket # 111, p. 2-3. Regarding Plaintiffs' claims under the doctrine of unjust enrichment, LAREB contends that Plaintiffs failed to establish the doctrine's requisites. In their reply, Plaintiffs concede that, at this juncture, summary judgment is unwarranted as to the fraud and negligence claims against LAREB because of LAREB's recent allegations that it lacked knowledge regarding Plaintiffs' existence, and allegations that Ayala's signature was forged in a contract with SANCO. See Docket # 134, p. 3. Nonetheless, pursuant to Fed.R.Civ.P.56(e)(1), Plaintiffs request that consideration of partial summary judgment against LAREB on these claims be continued until after discovery procedures are more advanced .[9] The Court sees no reason to deny Plaintiffs' request, and apparently, neither does LAREB as it failed to object to Plaintiffs' petition. Given LAREB's alleged lack of knowledge regarding such crucial matters, these claims are not ripe for adjudication. Accordingly, the Court grants Plaintiffs' request, thereby deferring summary judgment against LAREB on this front. This Court, moreover, will also defer Plaintiffs' claims against LAREB under the doctrine of unjust

---

they failed to include that cause of action in their complaint, the Court is "[f]oreclosed from considering it as a separate claim. . . ." Poultry & Beef of Puerto Rico, Inc. v. Smithfield Packing Co., 635 F.Supp. 1070, 1071 (D.P.R. 1986).

[9] Fed.R.Civ.P.56(e)(1) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may: (1) give an opportunity to properly support or address the fact. . . ."

enrichment, insofar as the doctrine's application is contingent upon the absence of other applicable precepts of law. See E.L.A. v. Cole, 164 P.R. Dec. 608, 632 (2005). [10]

SANCO also opposed. It alleges, among other things, that because the Court necessarily needs to consider the parties' state of mind at the time the contracts were executed, and because factual disputes exist, summary judgment should be denied. Docket # 116, p. 5. Plaintiffs also ask this Court to defer consideration with respect to their fraud and tort claims against SANCO, until after Plaintiffs have had a chance to obtain discovery on the additional facts asserted by SANCO's opposition. See Plaintiffs' Rule 56(e) Declaration of Plaintiffs' Counsel, Docket # 135-2, Exh. B.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir.2005).   In

---

[10] "Plaintiffs urge the court to consider now only those claims that do not require these two elements of knowledge (specifically, the implicit warranties provided by law, and the express warranties that LAREB made in the Assignment Letter)." Docket # 134, p. 4. But Plaintiffs predicate these claims upon Article 4.07 of Puerto Rico's General Corporation Law, P.R. Laws Ann. tit. 14, § 2727. As stated above, because Plaintiffs failed to include that cause of action in their complaint, this Court cannot consider it at this juncture. In their *reply* to SANCO and LAREB's oppositions, Plaintiffs, for the first time,  advance claims for purchaser's right of indemnity (*saneamiento*),and for hidden defects (*vicios ocultos*), P.R. Laws Ann. tit. 31, §§ 3831-3835 . Docket # 134, p. 6-9.  At this juncture, however, the Court will refrain from entertaining these as Plaintiffs failed to include them in their motion for partial summary judgment. See  L.Cv.R. (7)(c) ("A moving party my file a reply memorandum . . .[,] which shall be *strictly confined to replying to new matters raised in the objection or opposing memorandum*.") (emphasis added).

reaching such a determination, the Court may not weigh the evidence.  Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir.1994).  At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir.1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted).  "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir.2005) (quoting Garside, 895 F.2d at 48 (1st Cir.1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir.2008). "Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, '[e]vidence that is inadmissible at trial, such as, inadmissible hearsay, may not be considered on summary judgment.'" Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir.2005) (quoting Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998)).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir.2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990)).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir.1997).  Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary

judgment must present definite, competent evidence to rebut the motion." Méndez-Laboy v.

Abbot Lab., 424 F.3d 35, 37 (1st Cir.2005) (quoting from Maldonado-Denis v. Castillo

Rodríguez, 23 F.3d 576, 581 (1st Cir.1994)). "The non-movant must 'produce specific facts,

in suitable evidentiary form' sufficient to limn a trial-worthy issue. . . .Failure to do so allows

the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States,

924 F.2d 355, 358 (1st Cir.1991) (warning that "the decision to sit idly by and allow the

summary judgment proponent to configure the record is likely to prove fraught with

consequence"); Medina-Muñoz, 896 F.2d at 8 (quoting Mack v. Great Atl. & Pac. Tea Co., 871

F.2d 179, 181 (1st Cir.1989)) (holding that "[t]he evidence illustrating the factual controversy

cannot be conjectural or problematic; it must have substance in the sense that it limns differing

versions of the truth which a fact finder must resolve.").

**Material, Uncontested Facts[11]**

Between October 1 and November 9, 2009, SANCO and Plaintiffs negotiated the terms

for the acquisition of the metal located at the Mill; the same metal that SANCO had apparently

acquired the rights to from LAREB via a contract purportedly signed on October 1, 2009 (the

"LAREB-SANCO Contract I"). SUF ¶ 4.[12]  Plaintiffs–newcomers to the Puerto Rican scrap and

---

[11] Under Local Rule 56(c), if a nonmoving party includes any additional facts when opposing a motion for summary judgment, such facts must be in a separate section, set forth in separate numbered paragraphs, and supported by a specific record citation. The First Circuit has repeatedly held that when the parties ignore the Local Rules, they do so at their peril. See Ruiz-Rivera v. Riley, 209 F. 3d 24, 28(1st Cir.2000).The Court has therefore disregarded all additional facts that SANCO and LAREB provided without supporting record citations. For expediency and clarity, however, the Court will refrain from pointing out each instance of noncompliance; what follows are the facts the parties properly supported.

[12] LAREB-SANCO Contract I recited "it is estimated that exist (sic) approximately 30 thousand (sic) tons" and that [SANCO] was the additional business name of a California-based company. Through this document, LAREB purported to permit SANCO to remove and dispose of any and all the metal at the Mill. Id. ¶ 3. LAREB and Ayala consider this contract "[t]o be a sham." Docket # 110-1.

metal scene–were introduced to the Mill business by Zen America, a company well-versed in the scrap metal trade with prior involvement in Puerto Rico. Id. ¶ 5. Like Zen America, SANCO was also involved in the scrap metal industry in Puerto Rico. Id. With the exception of LAREB, all of the other defendants knew that Plaintiffs had no prior business experience in Puerto Rico. Id.

As part of these negotiations, Plaintiffs required SANCO to produce the following documents: (1) an Inspection Report validating the statement that the Mill contained approximately 30,000 tons of metal; and (2) proof of ownership over the Mill's metal, in the form of a letter from the previous owner. Id. ¶ 18. In fact, the SANCO-Plaintiffs Contract stated that the Inspection Report was a condition precedent for the execution of a contractual agreement between SANCO and Plaintiffs. Id. Specifically, Section I of the SANCO-Plaintiff Contract stated as follows: "Documents to be provided by SANCO prior to signing this contract[:] . . . Inspection Report." Docket # 1-4, Exh. D (caps omitted).

On November 4, 2009, SANCO obtained an "Assignment Letter" from Ayala, LAREB's president, stating as follows:

> I, the undersigned [LAREB] of Guayama, Puerto Rico, assign to [SANCO], the following: I am transferring the following to the Assignee: Sugar Plant at 758 Pitalaya in Arroyo, Puerto Rico. . . I warrant the following with regard to the property assigned herein:
>
> 1. I will not do any act which may prevent or hinder [SANCO] from enforcing the assigned right;
>
> 2. I have not done or knowingly permitted any act, deed or thing by which the right can be impeached or affected in any manner; and

---

LAREB claims that it "[d]id not execute a contract with SANCO on October 1, 2009, and upon inspection of the purported contract, Mr. Ayala, who supposedly signed the same on behalf of LAREB, conclude[d] that his signature has been forged or somehow placed into said document without his own effort and/or consent. . . ." Docket # 111, p. 6.

> 3. I will take all further steps necessary to give full effect to this Assignment.
>
> It is agreed that this Assignment will ensure to the benefit of and be binding upon the parties to this Assignment, their heirs executors, administrators, successors and assigns, respectively.[13]

SUF at ¶ 8.[14] Immediately thereafter, SANCO, through its then regional manager, showed the Assignment Letter to Plaintiffs. Id. ¶ 19.[15]

Before November 9, SANCO also showed and delivered to Plaintiffs a document entitled "Inspection Report by CIS Inspection Company" (the "Inspection Report"). In pertinent part, the Inspection Report stated that "[the] [Mill] appeared to have thirty thousand tons of metal approximately." Id. ¶ 11. Moreover, the Inspection Report, declared that it "[w]as performed on Nov 4, 2009," and that it was "[a] professional opinion . . . ." Docket # 1-3, Exh. C. It also contained a signature by Carlos Diah, the person who supposedly performed and prepared it.

---

[13] LAREB's purpose or intent in drafting this letter is disputed insofar as conflicting statements exist regarding this issue. See Docket # 110, p. 4, 7; Docket # 117, p. 4.

[14] Plaintiffs refer to these provisions as the "LAREB warranties." Docket # 134, p. 6. Specifically, they contend that, as a matter of law, one of the purposes of the Assignment Letter was to transmit LAREB's rights to the metal at the Mill over to SANCO. And another purpose of the Assignment Letter was to commit LAREB to take all further measures to give full effect to the Assignment. They argue that insofar as these are questions of law, they may be properly addressed via summary judgment. Id., p. 3. Whether an issue is a question of law, however, is for this Court to decide.

[15] Adorno was SANCO's Regional Sales Manager in Puerto Rico, id. ¶ 17; he ceased working for SANCO after the SANCO-Plaintiff contract was signed and the payments were made. He was also PRSD's President and its sole agent or officer listed on Puerto Rico State Department filings. Id. ¶70 The parties dispute, however, whether Adorno simultaneously worked for SANCO while also being at the helm of PRSD. Id. ¶ 47-48.

Id.[16] Furthermore, the Inspection Report also asserted that CIS Inspection Company was a federally-registered mark or name, and a copyright holder. Id. ¶ 12.

According to the undisputed facts, CIS Inspection Company was neither a federally-registered trademark, a trade name, nor a copyright. Id. ¶ 13. As a matter of fact, records showed that neither Carlos Diah nor CIS Inspection Company had done business in the United States or Puerto Rico during the past seven years. Id. It turned out, moreover, that CIS Inspection Company was a "doing business as" of Nguyen. Docket # 117 ¶ 13.[17]

On the morning of November 9, 2009, SANCO showed the LAREB-SANCO Contract I to Plaintiffs. Id. ¶ 15. Later that day, Adorno, on behalf of SANCO, and Plaintiffs, represented by Hoang, signed the SANCO-Plaintiffs Contract for the sale of all steel and/or scrap metal located at the Mill. "Approximately" 30,000 tons for the fixed price of $2,280,000, constituted the contract's consideration. Id. ¶¶ 16-17.  At that point, Plaintiffs had received from SANCO, among other documents required for the closing, the Inspection Report confirming that the Mill contained approximately 30,000 tons of metal. Plaintiffs did not verify the authenticity of these

_____

[16] Diah's identity and whereabouts are unknown. Surprisingly, SANCO has never attempted explain to this Court why Diah's signature appears on the Inspection Report; whether Diah is in fact a "professional"; and why Diah had not done business in Puerto Rico during the past seven years. These omissions are troubling.

[17] Plaintiffs allege that Nguyen was in charge of SANCO's activities at the Mill in November and December 2009, and that he is a principal executive of SANCO. SANCO, however, disputes this claim, arguing that Nguyen was a broker in the scrapmetal business and that he was told that LAREB was selling metal at the Mill. Similarly, a dispute exists regarding Nguyen's starting point: Plaintiffs allege that he was seen regularly at a contract mail receiving agency (in Santa Barbara, California) where SANCO received mail, whereas SANCO argues that Nguyen was a resident of Oregon before moving to Puerto Rico. See id. ¶¶ 67-68; Docket # 117 ¶¶ 67-68.

documents, but instead relied upon them when deciding to consent to the SANCO-Plaintiffs Contract. <u>Id.</u> ¶ 19.[18]

In the same time frame, Plaintiffs applied for and obtained a letter of credit ("L/C") from the Vietnam Joint Stock Commercial Bank and made three payments to SANCO's bank account: the first for $100,000; the next for $1,268,000, and the third for $912,000. <u>Id.</u> ¶¶ 24 & 25. The L/C required certain documents, including an Inspection Report representing conditions of quantity, which SANCO submitted to Plaintiffs. <u>Id.</u> ¶ 26; Docket # 1-7, Exh. G. As part of the transaction, Adorno, SANCO's then regional manager and against whom default has been entered, sent a Draw Request to Plaintiffs' bank in Vietnam, and included the following pertinent documents:  $2,280,000 invoice for "Any and all steel and/or [s]crap [m]etals [at] the [Mill] . . . Quantity: 30, 000 Mts (+/- 03 Pct)"; and a certificate signed by Adorno and SANCO, stating in pertinent part "[t]hat the goods [are] in primitive status. . . . [That SANCO] is the owner of said goods. . . . [and that SANCO] will take full responsibility if [Plaintiffs] [cannot] remove and process the good from [the Mill]." <u>Id.</u> ¶ 27(quoting Docket # 1-9 &10, Exh. I & J). On December 21, Plaintiffs made the final $912,000.00 payment to SANCO. <u>Id.</u> ¶ 28.

Unbeknownst to Plaintiffs, on December 15, 2009, LAREB and SANCO signed a contract, purportedly a "second" contract whereby SANCO acquired from LAREB "[a]ll the

---

[18] This Court notes that these are Plaintiffs' contentions, and Defendants cannot rebut them insofar as they describe Plaintiffs' state of mind. Nevertheless, LAREB and Ayala contend that Plaintiffs never contacted them or otherwise verified the validity and extent of the Assignment Letter, LAREB-SANCO Contract I, prior to contracting with SANCO. <u>See</u> Docket # 110, p.7.

**Civil No. 10-1610 (SEC)**                                                                11

rights and assets of the [Mill] . . . ." ("LAREB-SANCO Contract II"). Docket # 1-26, Exh. Z;

SUF ¶ 32.[19] In pertinent part, the contract read as follows:

> [SANCO] understands that [LAREB] is not the owner of the referred Project but
> has the control to sell everything that is steel, metal and/or any other scrap metal
> by virtue of a signed contract between [Asociacion] and [LAREB]. . . . [SANCO]
> commits to the disposal of all the toxic wastes; especially those of asbestos and
> the fulfillment of all the pertinent legal dispositions.

Id. ¶ 33. To further complicate things, the LAREB-SANCO Contract II had its own Exhibit I–

a November 23, 2009 instrument signed by Asociacion and LAREB, whereby LAREB acquired

the rights to remove the steel and scrap metal from the Mill. This instrument  revealed a new

fact: that"[LAREB] shall have a period of six months to retrieve all of the material acquired.

. . ." (the "Six-Month Restriction") Id. ¶ 34 (quoting Docket # 26, Exh. Z, p.3).[20] SANCO did

not inform Plaintiffs of the existence of the LAREB-SANCO Contract II, nor did anyone else

until LAREB apprised Plaintiffs sometime after February 2010. Id. ¶ 35.

       As a consequence of their transaction with SANCO, on January 14, 2010, Plaintiffs

signed a service agreement with PRSD to remove, process, transport, and load on to a vessel

---

       [19] As previously noted, LAREB and Ayala deny having executed the LAREB-SANCO Contract
I. See Docket # 110, p. 11. For clarity's sake, but without passing judgment on the LAREB-SANCO
Contract I's authenticity, the Court will refer to the December 15, 2009 contract as the LAREB-SANCO
Contract II.

       [20] SANCO alleges that, at the time of the signing of the LAREB-SANCO Contract II, it had
no knowledge of any time restrictions to extract metal because it was not made privy to the Exhibit I,
i.e., the LAREB-Asociacion contract containing the time restrictions. According to SANCO, at the
signing of that contract, LAREB's attorney "[r]ead a document purported to be Exhibit I to the contract
which was the letter of November 9, 2009 . . . wherein [Asociacion] . . . inform[ed] Ayala that after a
review of his proposal for the sale of all metal in the [Mill] they [had] decided to reach an agreement
with the company." Docket # 117 ¶ 34.

at a port in Puerto Rico, all of the scrap metal at the Mill ("PRSD-Plaintiffs Contract"). Things unraveled, and PRSD failed to obtain the CES Permit (Sediments and Erosions Control Plan) and the demolition permit. In response, LAREB requested an injunction in state court, alleging that SANCO and PRSD were working at the Mill without the necessary permits; PRSD failed to vacate or even reduce this injunction. Id. ¶¶ 41-42 & 58.[21] Ultimately, neither Zen America nor PRSD obtained the requisite permits nor shipped any metal to Plaintiffs. Id. ¶¶ 45-46.

In April 2010, an estimate by Gregorio Hernandez C.E. determined the amount of metal present at the Mill to be 3,000 tons +/- 50%, and "[a] virtual certainty that there are less than 15,000 metric tons of steel at the Mill." Id. ¶ 49 (quoting Docket # 20-4. Exh. IV). Furthermore, portions of the Mill contained asbestos and lead. Id. ¶ 51

A couple of days later, Plaintiffs wrote letters to (1) SANCO, seeking to resolve and terminate the SANCO-Plaintiffs Contract; to (2) LAREB, resolving and terminating the LAREB-SANCO Contract II; and to (3) PRSD, resolving and terminating the PRSD-Plaintiffs Contract. Id. ¶¶ 63-65.[22] Plaintiffs have received no metal from the Mill. Id. ¶ 61.

---

[21] As mentioned, although Adorno was SANCO's Regional Sales Manager in Puerto Rico (he ceased working for SANCO after the SANCO-Plaintiff contract was signed and the payments were made), *he was also PRSD's President and its sole agent* or officer listed on Puerto Rico State Department filings. SUF ¶ 17. Moreover, in order to extract, process, and ship the Mill metal, Plaintiffs first contracted with Zen America. Zen America failed to perform; whereupon Plaintiffs engaged PRSD to fill in the gap. Id. ¶¶ 43-44. Neither SANCO nor LAREB participated in Plaintiffs' negotiations with PRSD. Id. ¶ 38.

[22] Shortly thereafter, on May 6, 2010, LAREB filed a motion in the state court proceedings requesting an order directing PRSD to vacate the premises at the Mill and surrender any documents related to the mill demolition. Granting LAREB's motion, the state court entered an order directing PRSD to vacate the Mill, and to abstain from removing any metal located at the Mill. As part of the proceedings, LAREB argued that the SANCO-Plaintiffs Contract was invalid, because SANCO had contracted with Plaintiffs before December 15, 2009, the date that SANCO allegedly became the legal owner of the Mill metal per the LAREB-SANCO Contract II. SUF ¶¶ 59-60.

Notwithstanding their demands, all Defendants have refused to return Plaintiffs' moneys. Id. ¶ 66. Allegedly, Plaintiffs have suffered losses totaling $2,960,000: to (1) SANCO's bank account in the amount of $2,280,000; (2) Zen America's bank account for $240,000; and (3) Adorno's (PRSD) bank account in the amount of $440,000. Id. ¶ 69.

Presently, SANCO no longer operates businesses in Puerto Rico, and mail sent to SANCO's addresses has been returned. Likewise, mail delivered to Zen America's last known address in California has been returned saying that the addressee "moved and left no address." Similarly, PRSD is no longer in operation; attempts to deliver mail to its last known address have also proven fruitless. Id. ¶¶ 53-56.

Against this factual backdrop, Plaintiffs filed this motion for partial summary judgment.

**Applicable Law and Analysis**

In diversity cases such as this one, state law governs the substantive outcome. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 (1938); Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 403 (1st Cir.2009). When interpreting state law, federal courts employ the method and approach promulgated by the state's highest court. See Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio, 221 F.3d 235, 241-42 (1st Cir.2000). It is Puerto Rican hornbook law that "[f]ield of damages is governed–both in form and in content–by the civil law system." Valle v. American International Insurance Co., 108 Dec. P.R. 692, 8 P.R. Offic. Trans. 735, 736 (1979). Along the same vein, "[P]uerto Rico eschews common law principles of contract interpretation in favor of its own civil code derived from Spanish law." Borschow Hosp. and Medical Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 15 (1st Cir.1996) (citations omitted).

**Contractual claims against SANCO**

As previously noted, in their motion for partial summary judgment, Plaintiffs contend that this Court should annul their contract with SANCO since Plaintiffs' "[c]onsent was vitiated with substantial dolo." Docket # 14, p. 14. This, among other things, based on the undisputed fact that SANCO provided Plaintiffs with a "bogus" Inspection Report, a condition precedent to the execution of the SANCO-Plaintiffs Contract. Id., p. 14-15. In opposition, SANCO posits that deceit "cannot be summarily proven." Docket # 116, p. 13.

*Annulment of Contract because of deceit*

In Puerto Rico, "[t]he contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order." P.R. Laws Ann. tit. 31, § 3372. A contract, however, is only enforceable if it provides the essential conditions required for its validity. Id. § 3451. These elements or conditions are the following: "(1) The consent of the contracting parties[;] (2) [a] definite object which may be the subject of the contract[;] [and] (3) [t]he cause for the obligation which may be established." Id. § 3391. Plaintiffs' vitiated consent is the heart and thrust of their contractual claims against SANCO.

"Consent given by error, under violence, by intimidation, or deceit shall be void." Id. § 3404. But "if a contract contains the necessary effectuating requisites (including the consent of the contracting parties), 'although tainted with defect or vice, there is nonetheless a contract' because the defect may be cured.'" Dialysis Access Center, LLC v. RMS Lifeline, Inc., 638 F.3d 367, 378 (1st Cir.2011) (quoting Lummus Co. v. Commonwealth Oil Refining Co. 280 F.2d 915, 930 n. 21 (1st Cir.1960)). Said differently, while the contract exists, the party whose

consent was vitiated can void it, having 4 years "[f]rom the date of the consummation of the contract" to impugn it. P.R. Laws Ann. tit. 31, § 1253; <u>Garcia Lopez v. Mendez Garcia</u>, 102 P.R. Dec. 383, 393 (1974). Upon the expiration of the 4-year statute of limitations, the contract is deemed valid for all purposes. <u>Id.</u>

Puerto Rico law, moreover, "[d]istinguishes between contractual deceit occurring at the contracting stage (i.e., during the formation of the contract) and contractual deceit occurring in the course of the performance of the contract." <u>Dialysis Access Center</u>, 638 F.3d at 378 (citations omitted). Contractual deceit that occurs during the formation of the contract, that is, when a party obtains the consent of another through deceptive means, which is what concerns us here, may give rise to the nullification of the contract. <u>Id.</u>[23]

Against this backdrop, the Civil Code specifies that deceit or dolo "[e]xist when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." P.R. Laws Ann. tit. 31, § 3408. "In order that deceit may give rise to the nullity of a contract, it must be serious [as opposed to incidental], and must not have been employed by both of the contracting parties." <u>Id.</u> § 3409. Whereas serious deceit is essential to a party's consent and results in nullity, "[i]ncidental deceit merely influences consent and gives rise to a claim for damages." <u>Rodriguez-Bird v. Santander Securities Corp,</u> Civil No. 09–2238, 2010 WL 2541708 at *3 (D.P.R. June 17, 2010); <u>see also</u> <u>Dopp v. HTP Corp.,</u> 947 F.2d 506, 510 (1st Cir.1991).

---

[23] In contrast, "[c]ontractual deceit that arises . . . in the course of the performance of the contract, does not give rise to the nullification of the contract. Rather, in such cases, the person who engages in deceit shall be liable for the damage knowingly caused by his . . . nonfulfillment." <u>Id.</u> at 378-9 (citations and internal quotation marks omitted).

In line with the foregoing, "[t]he Puerto Rico Supreme Court has made clear that good faith on the part of contracting parties is 'always presumed,' and one seeking to rely on [deceit or] dolo to invalidate a contract must rebut the presumption of good faith with evidence of intentional fault or bad faith." Citibank Global Markets, Inc. v. Rodriguez Santana, 573 F.3d 17, 29 (1st Cir.2009) (quoting Citibank, N.A. v. Dependable Ins. Co., 121 P.R. Dec. 503, 21 P.R. Offic. Trans. 496, 506, 512 (1988)). However, for contractual deceit to exist, "[a] mischievous act is not needed, but only the debtor's knowledge of his/her own lack of compliance, with the consciousness that the creditor's expectations will be affected." Century Packing Corp. v. Giffin Specialty Equip. Co., LLC, 438 F.Supp.2d 16, 26 (D.P.R.2006) (emphasis added) (citing Mayaguez Hilton Corp. v. Betancourt, 156 P.R. Dec. 234, 253 (2002)).

Turning to the facts in this case, it is undisputed that, prior to signing the SANCO-Plaintiffs Contract, SANCO had to provide Plaintiffs with, among other things, an Inspection Report. Likewise, no dispute exists regarding the fact that SANCO provided Plaintiffs with the required "Inspection Report" by CIS Inspection Company, apparently performed and signed by Carlos Diah. The Inspection Report stated that it "[w]as performed on Nov 4, 2009," and that it was "[a] professional opinion . . . ." Docket #1-3, Exh. C. ("Exhibit C"). [24] Furthermore, no

---

[24] SANCO denies this fact, stating that "[t]he Inspection Report by CIS Inspection Company" was made by Mr. Nguyen through his DBA CIS Inspection. . . ." Docket # 117 ¶ 11. But SANCO's perfunctory denial cannot cast a doubt on the authenticity of Exhibit C's content; SANCO does not contest Exhibit C's accurateness. Indeed, SANCO admits that it knew the Inspection Report was "made" by Nguyen, id.; Nguyen's Statement at Docket # 117-1, Exh. 1 ¶ 13. Nevertheless, per the Inspection Report's clean and unambiguous language, it was signed and prepared by Diah. It is thus undisputed that, according to uncontested text of the Inspection Letter, it was Diah who signed and prepared it. Consequently, the Court deems Plaintiffs' Uncontested Fact No. 11 as unopposed. Cf. DeLia v. Verizon Communications Inc., No. 09–2667, 2011 WL 3688995 at *2 (1st Cir. Aug 24, 2011) ("A properly supported motion for summary judgment cannot be defeated by relying upon conclusory allegations, improbable references, acrimonious invective, or rank speculation.") (quoting Ahearn v. Shinseki, 629 F.3d 49, 54 (1st Cir.2010)).

**Civil No. 10-1610 (SEC)**                                                                              **17**

one disputes that the identity and whereabouts of Diah, the purported "professional" who "performed" and "signed" the Inspection Report, are a mystery. In fact, both Nguyen and SANCO agree that Nguyen "made" the Inspection Report. See infra n. 24. But neither Nguyen nor SANCO say anything about Diah; let alone whether Diah is indeed a "professional" vel non, trained to inspect and estimate the Mill's various components. Indeed, neither SANCO nor Nguyen *even mentions* Diah's name in their numerous submissions to the Court. To make matters worse, the Inspection Report stated that CIS Inspection Company was a federally-registered mark or name, and a copyright holder. According to the undisputed facts, however, it was a bogus entity, being neither a federally-registered trademark, nor a trade name, nor a copyright.

To cinch matters, undisputed records showed that neither Diah nor CIS Inspection Company had done business in the United States or Puerto Rico during the past *seven* years. And CIS Inspection Company turned out to be a "doing business as" of Nguyen. That Nguyen masterminded the Inspection Report is particularly troubling as Nguyen, by his own admission, actively participated in "brokering" the sale of the Mill's metal. See Docket # 117-1, Exh. 1 ¶¶ 4-11. Further, the Court notes that SANCO and Nguyen find themselves in cahoots in the instant case. Indeed, besides their protagonist role in the "business" with Plaintiffs, SANCO and Nguyen now share the same counsel, as well as identical defenses. The Court cannot overlook that, after soliciting the return of their money, Plaintiffs found out that SANCO no longer did business in Puerto Rico, as it left the island abruptly, shortly after the Mill incident.

The cumulative weight of the foregoing undisputed facts necessarily lead to the conclusion that the Inspection Report provided by SANCO contained misrepresentations, or at the very least, grave inaccuracies. SANCO, moreover, does not deny its knowledge concerning

the Inspection Report's misrepresentations. Said differently, according to SANCO's own words, it knew that the Inspection Report was "made" by Nguyen but nevertheless presented it to Plaintiffs as performed and signed by Diah, the purported "professional." See Docket # 117 ¶ 11. More important, SANCO has made no attempt to distance itself from the Inspection Report or otherwise create a triable issue of motive or intent. These circumstances suffice to conclude that the "presumption of good faith" that permeated the SANCO-Plaintiffs Contract has been effectively rebutted by the foregoing undisputed facts. See Citibank Global Markets, 574 F.3d at 29. See generally 2 McCormick On Evid. § 344 n. 6. (6th ed. 2009) (comparing presumptions with "[b]ats of the law flitting in the twilight, but disappearing in the sunshine of actual facts") (citation omitted).

The threshold matter, however, is whether SANCO's concealment and silence regarding the Inspection Report constitute a "[w]illful and conscious breach of a juridical duty . . . ." Marquez v. Torres Campos, 111 P.R. Dec. 854, 864, 11 P.R. Offic. Trans. 1085 (1982) (citation omitted).The Court finds particularly instructive the aforementioned Supreme Court of Puerto Rico opinion. There, confronted with a situation similar to the one here, the court annulled a contract for the sale of cattle, determining that the seller's "[d]eceitful action, consisting in his willful and conscious silence about the cattle's contagious condition [tuberculosis] . . . . [,]" vitiated the buyer's consent with dolo. Torres Campos, P.R. Dec. 854 at 871 (footnote omitted).Then, in Colon v. Promo Motor Imports, Inc., 144 P.R. Dec. 659, 670 (1997) 144 P.R. Dec. 659, Puerto Rico's highest court similarly invalidated a contract, ruling that a car vendor who had lied to a potential buyer about obtaining car financing, vitiated his consent with deceit. The court underscored that obtaining car financing constituted an essential condition for the buyer's consent to the contract. Finally, in Bosques v. Echevarria, 162 P.R. Dec. 830, 837 (2004), the most recent iteration, the Puerto Rico Supreme Court annulled a contract because

**Civil No. 10-1610 (SEC)**                                                                          **19**

of deceit, after an used car vendor concealed from the buyer that the car had been involved in a collision.

In the case at hand, the Inspection Report was a condition precedent to the execution of the SANCO-Plaintiffs Contract. But SANCO remained silent about the fact that it was co-defendant Nguyen–a party with substantial interest to the transaction, and certainly not a professional as touted in the Inspection Report–who "made" it. This, coupled with the undisputed facts that neither Diah nor CIS Inspection Company had been doing business in the United States or Puerto Rico during the past seven years, clearly support the inference that SANCO acted in bad faith. Cf. Torres v. Garcia, 119 P.R. Dec. 698, 703 19 P.R. Offic. Trans. 742 (1987) (affirming that "precontractual negotiations trigger a social relationship which imposes on the parties the duty to act in good faith"); Muñiz v. Copan, 113 Dec. P.R. 417, 528,13 P.R. Offic. Trans. 664 (1982) (stating that "[g]ood faith . . . imposes on the parties . . . an archetype of social conduct, loyalty and fidelity to the word given . . . and consists in that every party to the contractual relation commits himself trustingly to the loyal conduct of the other party. . . .") (citation omitted)(alterations in original). Through its silence and concealment regarding the Inspection Report's misrepresentations, SANCO not only acted in bad faith, it also acted deceitfully.

By the same token, the Court concludes that, as a direct consequence of SANCO's deceitful concealment, Plaintiff's consent in contracting with SANCO was vitiated with deceit Torres Campos, P.R. Dec. 854 at 871 n. 19 ("The [Spanish]doctrine accepts that it is deceitful to remain silent about . . . *an important circumstance* . . . .") (emphasis added) (citation omitted); Fournier v. Eastern Airlines, Inc., 655 F.Supp. 1037, 1039 (D.P.R.1987) (stating that

"[d]olo can manifest itself through words which induce a contracting party to err, such as affirmations of qualities that he knows do not exist") (internal quotation marks omitted).[25]

Furthermore, the nature of the deceit here is serious. As mentioned, this is crucial distinction since "[d]eceit of a serious nature will render the contract null whereas incidental deceit will merely cause indemnification of the damages incurred." Ocaso, S.A., Compania De Seguros Y Reaseguros v. Puerto Rico Maritime Shipping Authority, 915 F.Supp. 1244, 1257 (D.P.R.1996). Plaintiffs aver that they "[w]ould not have contracted with SANCO had they known that the [Inspection Report's] representations made by [SANCO] were untrue." Docket # 44, p. 15. This contention does not stand alone, however. It is buttressed by an undisputed and compelling fact: the Inspection Report was a sine qua non to the execution of the SANCO-Plaintiffs Contract. Given that Plaintiffs–prior and as conditions to disbursing millions of dollars– required SANCO to produce an Inspection Report, this essential condition was determinative to Plaintiffs' consent, and as such, of serious or substantial nature. P.C.M.E. Commercial, S.E. v. Pace Membership Warehouse, Inc., 952 F.Supp. 84, 92 (D.P.R.1997); see also Dopp, 947 F.2d at 510; Promo Motor Imports, Inc., 144 P.R. Dec. at 669.

---

[25] In determining whether to nullify a contract based on deceit, the Puerto Rico Supreme Court has placed considerable weight on the education, social background, economic status, and business experience of the party seeking to void the contract. E.g., Miranda Soto v. Mena Ero, 109 P.R. Dec. 473, 9 P.R. Offic. Trans. 628, 634 (1980) (citations omitted). In the instant case, SANCO knew that Plaintiffs, who hailed from distant Vietnam, were newcomers to the Puerto Rican scrap and metal trade and that, as foreigners and non-lawyers, their investment in the Mill was their first business in this jurisdiction. SUF ¶ 5. After all, in the cultural context of Vietnamese businesspeople, parties do not normally question the authenticity of documents offered by the other party. Id. ¶ 43 (citing Declaration of Mai). More important, SANCO fails to point out to this Court that Plaintiffs could have had considerable business experience or education, or other factors that might dissuade this Court from annulling the SANCO-Plaintiffs Contract. Regardless, the fact that Plaintiffs were neophytes to the Puerto Rican scrap and metal trade and spoke little or no Spanish clearly militate in favor of nullification.

In its opposition, SANCO argues that "[f]or dolo to be the cause of nullity of a contract it must be made by both contracting parties since incidental dolo only gives rise to a damages claim." Docket # 116, p. 13. SANCO, however, misreads the clear and unambiguous text of the Civil Code's Article 1222, P.R. Laws Ann. tit. 31, § 3409, which declares the complete opposite: that for "[d]eceit to give rise to the nullity of a contract, . . . *it must not* have been employed by *both* of the contracting parties." (emphasis added). With absolutely no legal or factual support, SANCO alleges that "[i]f anyone should be held liable for deceit, it should be [Plaintiffs]. Docket # 116, p. 15. Because SANCO has failed to "spell out [this] argument squarely and distinctly," <u>Rivera-Gomez v. de Castro</u>, 843 F.2d 631, 635 (1st Cir.1988), this Court will not consider it further. <u>See also</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir.1990) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); <u>Harriman v. Hancock County</u>, 627 F.3d 22, 28 (1st Cir.2010).

SANCO also alleges that "[d]eceit cannot be presumed. . . .Therefore, deceit cannot be summarily proven." Docket # 116, p. 13. Of course, this Court has never presumed the existence of deceit. To be sure, the "presumption of good faith" that permeated the SANCO-Plaintiffs Contract was said to have been rebutted by material and undisputed facts showing SANCO's bad faith in connection with the Inspection Report. This argument is thus unavailing.

The same holds true with respect to SANCO's argument that deceit cannot be summarily proven. First, SANCO provides this Court with no case law supporting its contention. And second, in <u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 841-2 (1st Cir.1993), the First Circuit held that "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory

allegations, improbable inferences, and unsupported speculation." Compare Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir.1996) (stating that "[d]eterminations of motive and intent, *particularly in discrimination cases*, are questions better suited for the jury.") (emphasis added) (citation omitted); with Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir.1990) (explaining that the First Circuit "will not refuse to affirm, even in . . . cases [involving intent], when the non-movant rests merely upon unsupported allegations and speculations").

Here, SANCO does not even try to distant itself from the Inspection Report's misrepresentations by perhaps arguing that it was not privy to its multiple inaccuracies. Nor does SANCO deny that, through its silence, it concealed from Plaintiffs crucial facts concerning the Inspection Report. This is bolstered by the fact that the record contains no evidence "sufficiently open-ended to permit a rational fact finder to resolve" this issue in favor of SANCO. Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856 (1st Cir.2008) (citation omitted). Indeed, with respect to this claim, SANCO has failed to come forward with "[s]pecific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 106 S.Ct. 2548, 2554 (1986) (citation omitted). On the contrary, no matter how much discovery ensues, the incontrovertible facts remain the same: SANCO concealed from Plaintiffs that Nguyen– and not Diah as SANCO made Plaintiffs believe–had prepared the Inspection Report; that Diah had not done business in Puerto Rico for the past 7 years; and that CIS Inspection Company was neither a federally-registered trademark nor a copyright. Furthermore, SANCO abruptly exited the Puerto Rican market following the Mill "business." The foregoing facts suffice to conclude that SANCO has failed to support its opposition with strong competent evidence to create a triable issue of motive or intent.

SANCO also cites <u>Canales v. Pan American</u>, 112 P.R. Dec. 329, 338, 12 P.R. Offic. Trans. 411 (1982) in support of its proposition that there can be no deceit without intent. Docket # 146, p. 12. But the discussion in Canales was expressly limited to the other type of deceit, to wit, deceit occurring in the course of the performance of the contract. See <u>Canales</u>, 112 P.R. Dec. at 338. That case is thus inapplicable to the deceit involved here, <u>i.e.</u>, deceit during the formation of the contract. Even assuming that <u>Canales</u> controlled here, SANCO has not set forth sufficient evidence to create a triable issue of motive or intent regarding its admitted knowledge of the Inspection Report's misrepresentations. And the fact that SANCO, notwithstanding their knowledge, concealed these to Plaintiffs is compelling circumstantial evidence indicative of SANCO's bad faith.  See <u>Citibank v. Dependable Ins. Co., Inc.</u>, 121 P.R. Dec. 503, 518, 21 P.R. Offic. Trans. 496 (1988); <u>Torres Campos</u>, P.R. Dec. 854 at 871; <u>cf</u>. <u>Muñiz</u>, 113 Dec. P.R. at 528 (imposing upon the parties "[t]he obligation to conduct themselves according to good faith in the sense that each is burdened by a reciprocal loyalty to observe a conduct that is socially valuable and demandable") (citation omitted).

SANCO next asserts that "[d]eceit . . . ha[s] to be proven with strong, convincing and conclusive evidence." Docket # 116, p. 13. In support of this equivocated notion, SANCO relies heavily in <u>In re Las Colinas, Inc.</u>, 294 F. Supp. 582 (D.P.R.1968), <u>rev'd on other grounds</u>, 426 F.2d 1005 (1st Cir.1970). But SANCO's dependence on that case is problematic in at least three ways. First things first: Puerto Rico Supreme Court opinions posterior to <u>In re Las Colinas</u> explicitly held that the burden of proof in a deceit or fraud claim was no longer the almost impossible burden of "solid, clear, convincing and unquestionable" evidence. See e.g., <u>De Jesus Diaz v. Carrero</u>, 112 P.R. Dec. at 639; 12 P.R. Offic. Trans 786. The <u>De Jesus Diaz</u> Court squarely addressed the issue by stating the following:

In <u>Carrasquillo v. Lippitt & Simonpietri, Inc.</u>, 98 [P.R. Dec.] 646, 649 (1970), and in <u>García López v. Méndez García</u>, 102 [P.R. Dec.] 383, 386 [2 P.R. Offic. Trans 481] (1974), we abandoned the classification of "solid", "clear and convincing", and "unquestionable" evidence . . . to note that the general rule that fraud is not presumed only means that the one affirming it must prove it with reasonable certainty, with preponderance of evidence that satisfies the trier's conscience. In this way, the obstacle requiring a higher degree of evidence, which served no other purpose but to give to the agent of fraud a special protection other defendants do not have, was eliminated.

<u>Id.</u> at 639, 12 P.R. Offic. Trans 786; <u>Garcia Lopez</u>, 102 Dec. P.R. at 386 (holding that there is no "[f]undamental difference between the non presumption of fraud and the general rule requiring preponderance of evidence to establish a fact"). As previously noted, Plaintiffs have proven with preponderance of evidence that SANCO vitiated their consent with dolo by either remaining silent or otherwise concealing essential facts surrounding the Inspection Report. Here, this Court is convinced that Plaintiffs have established SANCO's deceit "with reasonable certainty so as to satisfy the conscience of the trier." <u>Garcia Lopez</u>, 102 P.R. Dec. at 386; <u>Torres Campos</u>, 111 P.R. Dec. at 871 n. 19 (holding that deceit "does not have to be proved directly and may be inferred from circumstantial evidence, as any other fact") (citation omitted).

Second, <u>In re Las Colinas</u>, a 40 year old case, eschewed Puerto Rico law in favor of federal law. Indeed, this case nowhere mentions the Puerto Rico Supreme Court jurisprudence highlighted above. This, in turn, opens the door to the possibility of a pre-Erie scenario, where the substantive law governing the outcome of a tort suit varied depending on whether redress was sought in federal or state court. See <u>Erie R.R. Co.</u>, 304 U.S. at 64. For sound constitutional and equitable reasons, however, the U.S. Supreme Court completely shut this door with <u>Erie</u>.

And third, the claims in <u>In re Las Colinas</u> centered around fraud, not dolo. Although throughout its opposition, SANCO seems to treat dolo and fraud as one and the same, they are

in fact two different specimens.[26]  Indeed, "[t]he terms dolo and fraud should not be confused. Dolo has the characteristic of being anterior to the act that it vi[t]iated, and is exercised in front of one of the parties; fraud is exercised by the contracting parties, or an isolated, in order to prejudice the right acquired by a third party." <u>Fournier v. Eastern Airlines, Inc.</u>, 655 F.Supp. at 1038 (D.P.R.1987) (internal quotation marks omitted). Fraud, unlike dolo, requires allegations of reliance to support the fraud claim.  <u>See e.g.</u>, <u>Microsoft Corp. v. Computer Warehouse</u>, 83 F.Supp.2d 256, 262 (D.P.R.2000) (listing elements of fraud under Puerto Rico law). Lastly, dolo does not require proof of detrimental reliance on false representation. <u>See</u> <u>Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp.</u>,92 F.Supp.2d 8, 19 (D.P.R.2000) (explaining the subtle, but important differences between dolo and fraud, and that "[d]olo may be manifested by the presence of malice or intent without accompanying false representations, belief in false representations, or detrimental reliance").

SANCO has one last arrow in its quiver: it posits that, pursuant to Fed.R.Civ.P.56(d), summary judgment is precluded because "[f]ull discovery must be had to properly address any matters regarding facts which were denied for lack of knowledge." Docket # 146. In support, it includes almost identical statements by Nguyen and Lyvuong, asking this Court to provide SANCO with an opportunity to conduct discovery regarding Plaintiffs' state of mind at the time of the SANCO-Plaintiffs Contract, and as to Plaintiffs' contracts with other co-defendants. Docket # 146-5 & 6, Exh. E, F. They also note that SANCO is in the process of contracting an expert to "counter" the report made by Dr. Hernandez, Plaintiffs' expert. <u>Id.</u> None of the concerns identified by SANCO, however, are material to the decision reached by this Court

---

[26] The etymological roots of the  word 'dolo' trace back to the Roman and civil law tradition. In Latin, <u>dolus</u> means device or artifice. Black's Law Dictionary 557 (9th ed.2009).

**Civil No. 10-1610 (SEC)**                                                                                   **26**

today. Nor do they create a genuine issue of material fact, see Beverly v. Wal-Mart Stores, Inc., No. 10–31041, 2011 WL 2437835 at *3 (5th Cir. June 15, 2011) (holding that "[t]o obtain a continuance of a motion for summary judgment for discovery purposes, . . . a party must set forth . . . how additional discovery will create a genuine issue of material fact" (internal quotation marks omitted). Because the Inspection Report was a condition precedent to the execution of the contract, Plaintiffs' state of mind at that time turns irrelevant. Said differently, regardless of Plaintiffs' state of mind that day, this Court would have reached the same result. Finally, Dr. Hernandez's report had no bearing on today's decision, and  the facts that SANCO denied for lack of knowledge were of no consequence to the Court's determination. In sum, because SANCO has "[f]ailed to show how allowing additional discovery would preclude summary judgment," Thurston v. City of North Las Vegas, No. 10–0516, WL 3841110 at *3 (D.Nev. Aug 29, 2011),  with respect to SANCO's deceit in connection with the Inspection Report, its request is **DENIED**.

Because Plaintiffs have initiated a timely action for nullity, and because Plaintiffs have proven with a preponderance of evidence that their consent, an essential element for a contract's existence, was vitiated with substantial dolo, the SANCO-Plaintiffs Contract is hereby annulled. See P.R. Laws Ann. tit. 31, § 3511-3512.

When a contractual obligation has been declared null, the Civil Code provides for the restoration, of "the things which have been the object of the contract with their fruits, and the value with its interest. . . ." Id. § 3514; Sanchez Rodriguez v. Lopez Jimenez,116 P.R. Dec. 183, 16 P.R. Offic. Trans. 214 (1985). In light of the foregoing, SANCO shall return to Plaintiffs $2,280,000, "[w]ith their fruits, and the value with its interest." Id. The parties shall file

**Civil No. 10-1610 (SEC)**                                                                    **27**

simultaneous informative motions regarding the proper calculation of these remedies in conformity with the Civil Code and its interpretative case law.

Having annulled the SANCO-Plaintiffs Contract, the Court need not consider the remainder of Plaintiffs' contractual claims against SANCO, namely the alleged breach of contract. The same applies to Plaintiffs' tort claims. See Ramos v. Orientalist Rattan Furniture, Inc., 130 P.R. Dec. 712, 727, 1992 P.R.-Eng. 755,597 (1992) (holding that if a party has claims stemming from both tort and contract, it may only recover under one of them). On this record, Plaintiffs' partial summary judgment against SANCO is **GRANTED**.

**Conclusion**

For the reasons elucidated above, summary judgment on Plaintiffs' claims for contractual deceit against SANCO is hereby **GRANTED**. Accordingly, Plaintiffs' motion for partial summary judgment is **GRANTED IN PART AND DEFERRED IN PART.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of September, 2011.

*s/Salvador E. Casellas*
Salvador E. Casellas
U.S. Senior District Judge